IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **FWB, LLC,** | CASE NO. 3:20 CV 70 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **AUTO-OWNERS (MUTUAL) INSURANCE CO.,** | |
| | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

### INTRODUCTION

On December 19, 2019, FWB, LLC, doing business as South End Grille ("Plaintiff"), brought this action in the Lucas County Court of Common Pleas asserting state law claims of breach of contract, negligence, and breach of good faith, against Auto Owners Insurance Company ("Defendant"). (Doc. 1-1). Defendant removed the case to this Court on January 14, 2020 (Doc. 1), and Plaintiff later filed an Amended Complaint (Doc. 23). The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. 34), to which Plaintiff filed an opposition (Doc. 37), and Defendant replied (Doc. 39).

For the reasons contained herein, the Motion for Summary Judgment (Doc. 34) is GRANTED.

**BACKGROUND**

Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:

FWB, LLC owned and operated South End Grille in Toledo, Ohio. (Doc. 32-1, Bussdieker Deposition, 7:22-25, 8:1) ("Bussdieker Depo."). Fred Bussdieker and Lonnie Good were FWB's members. (Bussdieker Depo. 17:3-11, 19-20); *see also* Doc. 34-2, at 5 (Intent to Purchase Agreement). Bussdieker performed the day-to-day management of South End Grille from its opening in 2015 through August 2017. (Doc. 37-1, at ¶¶2-3, Bussdieker Affidavit) ("Bussdieker Aff."). The bar thrived under his watch. *Id*. At all times relevant to this case, Defendant insured the business; the premiums were paid and current. *Id*. at ¶¶4-5. On April 28, 2017, as part of a policy-obligated audit by Defendant of South End Grille's 2015-2016 revenues, Plaintiff provided information on its revenues to Defendant through an independent insurance agent. *See* Doc. 37-4 (email).

Bussdieker stepped back from business operations in August 2017. (Bussdieker Aff. at ¶6). Good ran the South End Grille unsuccessfully in September of 2017, *id.*, and the business ultimately closed that same month. (Bussdieker Depo. 76:20-25, 77:1). Under Good's watch, the business was not profitable as it was being mismanaged. *Id*. at 77:2-4. Following Good's brief tenure, on September 21, 2017, Bussdieker and Good entered into an agreement with Dohnovan Walton and Travis Murphy to act as general managers and run the business. (Bussdieker Aff. at ¶8); *see also* Doc. 34-2. Under the agreement, Walton and Murphy operated the business and paid a monthly amount to Plaintiff for the right to manage, intending to purchase the business outright. *See* Doc. 34-2. On October 24, 2017, Plaintiff's insurance agent emailed a commercial underwriter an application for insurance coverage for South End Grille on behalf of Walton and Murphy. (Doc.

2

37-6) (email). In the email, the agent acknowledged Walton and Murphy did not qualify for Defendant's business coverage because they lacked prior restaurant ownership experience. *Id*. The agent also noted Bussdieker "ha[d] sold/is selling" South End Grille to Walton and Murphy. *Id*. The next day, October 25, 2017, the underwriter responded to the agent asking some follow-up questions regarding Walton and Murphy's plans for the business as well as past revenue amounts. (Doc. 37-5, at 1-2). The agent responded, explaining monthly sales figures for South End Grille were $38,200 per month. *Id*. at 1.

In October 2017, business revenue was poor while Walton and Murphy remained in control of South End Grille. (Bussdieker Aff. at ¶9). Walton and Murphy also stopped making monthly payments to Plaintiff at that time. *Id*.

On December 18, 2017, during a premises inspection, Bussdieker told an Ohio Department of Liquor Control agent he leased the business to Walton weeks prior. (Doc. 34-1, at 49). Walton signed a liquor permit correction the same day, identifying himself as the new owner. *Id*. at 47. The liquor permit was placed in Safekeeping by the State of Ohio effective December 27, 2017, the day prior to the fire. *Id*. at 50.

Fire heavily damaged the South End Grille in the early morning hours of December 28, 2017. (Bussdieker Depo. 11:1-4, 62:1-12); *see also* Doc. 34-6, at 1 (letter). As a result, the business did not resume normal operations. (Bussdieker Aff. at ¶16). Further, because the fire originated in the business office, a substantial amount of records and equipment were lost. *Id*. at ¶18. Plaintiff "reconstruct[ed]" some past revenue based upon state tax reporting and information recovered from backup software. *Id*.; *see also* Docs. 37-9, 37-10 (revenue summaries).

In January 2018, Cousino Restoration gave an estimate for repair and cleaning of South End Grille. (Doc. 34-4). Cousino never performed any work at the restaurant. (Bussdieker Depo.

3

96:1-25). Once Bussdieker saw the Cousino estimate, and learned the company wanted to be paid up front, he decided to perform the cleaning himself. *Id.* at 57:5-17.

Plaintiff's liquor permit expired on June 1, 2018 and had not been renewed as of September 11, 2018. (Doc. 34-1 at 55-56). In a letter to the Ohio Department of Liquor Control dated October 24, 2018, Bussdieker stated he was actively seeking one or two buyers for the business as he "d[idn't] want nothing to do with" it anymore. *Id*. at 60.

Bussdieker executed a "Sworn Statement in Proof of Loss" to Defendant on June 11, 2018. *See* Doc. 34-7. Therein, on a "Personal Property Inventory" worksheet, he listed Plaintiff's liquor permit, valued at $2,844, as a loss incurred during the fire. *Id.* at 9. He also included a $13,300.96 line item cost for Cousino Restoration. *Id.*

On June 21, 2018, Defendant's claim representative Douglas Guhl sent Plaintiff a letter detailing the covered and uncovered portions of the insurance claim. *See* Doc. 34-6. Defendant ultimately paid Plaintiff a total of $33,780.76 on the claim - $14,900 for lost business income, and $18,880.76 for property damage and cleaning. (Bussdieker Depo. 24:16-25, 25:1); *see also* Doc. 34-6.

STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party.

4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. Further, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* FED R. CIV. P. 56(c)(3) (noting that the court "need consider only the cited materials").

## DISCUSSION

Plaintiff asserts three causes of action against Defendant: breach of contract (Count One), negligence (Count Two), and breach of the duty of good faith (Count Three). *See* Doc. 23 (First Amended Complaint). It alleges Defendant failed to fully compensate for the damage sustained from the December 2017 fire. *Id*. at 2. Specifically, Plaintiff argues Defendant failed to fully compensate its business income losses and the full cost associated with cleaning restaurant equipment. (Doc. 37, at 9-13). Defendant argues it is entitled to summary judgment on each of Plaintiff's claims. Defendant asserts Plaintiff has been fully compensated under the terms of the insurance contract and it owes nothing more because Plaintiff voided coverage when it: 1) materially misrepresented the value of its claims, and 2) failed to comply with the policy's terms and conditions. *See* Doc. 34. For the reasons contained herein, the Court grants summary judgment to Defendant on each of Plaintiff's claims and dismisses the case with prejudice.

As an initial matter, in Ohio, "an insurance policy is a contract between an insured and the insurer." *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co*., 861 N.E.2d 121, 126 (Ohio 2006). An insurance contract must be construed to give words their plain and ordinary meaning. *State Farm Auto. Ins. Co. v. Rose*, 575 N.E.2d 459, 461 (Ohio 1991), *rev'd on other grounds*, 620 N.E.2d

809 (Ohio 1993). However, if the language is ambiguous, and thus susceptible to more than one interpretation, it must be liberally construed in favor of the insured. *Id.; see also Akins v. Harco Ins. Co.*, 815 N.E.2d 686, 693 (Ohio Ct. App. 2004) ("[A]ny reasonable construction which results in coverage of the insured must be adopted by the trial court."), *rev'd on other grounds*, 830 N.E.2d 1161 (Ohio 2005). Importantly, "[u]nder Ohio law, the burden is on the insured to prove that he is entitled to coverage by showing facts sufficient to establish that his loss was within the description of the policy." *State Farm Fire & Cas. Co. v. Hiermer*, 720 F. Supp. 1310, 1314 (S.D. Ohio 1988) (citing *Sterling Merch. Co. v. Hartford Ins. Co.*, 506 N.E.2d 1192, 1199 (Ohio Ct. App. 1986) ("The burden, however, is not on the insurer, but on the insured to prove that he is entitled to coverage.")), *aff'd*, 884 F.2d 580 (6th Cir. 1989) (unpublished table decision).

Breach of Contract – Count One

*Business Income Loss*

Defendant asserts it paid Plaintiff a total of $33,780.76 to settle the insurance claim at issue. (Doc. 34, at 19). It argues this amount covered the damage to, and cleaning of, Plaintiff's personal property, as well as lost business income. *Id*. Of this total, Defendant paid $14,900 for lost business income.[1] (Bussdieker Depo. 24:20-25, 25:1); (Doc. 34-6, at 1-2). Plaintiff argues it is owed an

---

1. The $14,900 represents the sum of the $4,100 payment to Plaintiff's landlord and six months of $1,800 loan payments from Walton and Murphy. (Doc. 34-6, at 1).

Moreover, in his affidavit, Bussdieker contends Defendant only paid him $4,100 on the lost income claim. (Doc. 37-1, at ¶24). This contradicts Bussdieker's earlier deposition testimony that the payout was $14,900. (Bussdieker Depo. 24:20-25, 25:1). Defendant asserts the lost income payout was $14,900. (Doc. 34-6, at 1-2). Plaintiff cannot create a factual dispute by testifying to one amount, then later swearing to a different amount in an affidavit. *Boykin v. Fam. Dollar Stores of Mich., LLC*, -- F.4th --, 2021 WL 2708859, at *7 (6th Cir.) ("[Defendant] invokes our 'sham affidavit' rule. This rule provides that a party cannot create a genuine dispute of material fact with an affidavit that conflicts with the party's earlier testimony about the fact.").

additional $33,632.02. (Doc. 37, at 5). It asserts this figure represents the proper lost income calculation which is based upon a six-month restoration period, as agreed, and the income considered should be six times the business's monthly average income when Bussdieker ran it. *Id*. Defendant contends it properly paid the lost income claim based upon the information provided by Plaintiff during the claims process and any failure on Plaintiff's part to provide proper documentation violated the terms and conditions of the insurance contract. *See* Doc. 34, at 19-29.

This dispute may be resolved by looking at the unambiguous language of the parties' insurance contract. The following language is relevant to the business income calculation:

> **A. COVERAGE**
>   **1. Business Income**
>   Busines Income means the:
>   **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>   **b.** Continuing normal operating expenses incurred, including payroll.
>
> \*\*\*We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".
>
> ***
>
> **C. LOSS CONDITIONS**
> ***
>   **2. Duties In The Event Of Loss**
>   **a.** You must see that the following are done in the event of loss: \*\*\*
>   **(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
>
> ***
>
>   **3. Loss Determination**
>   **a**. The amount of Business Income loss will be determined based on:
>   **(1)** The Net Income of the business before the direct physical loss or damage occurred;
>   **(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

7

> **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damages; and
> **(4)** Other relevant sources of information, including:
>  **(a)** Your financial records and accounting procedures;
>  **(b)** Bills, invoices and other vouchers; and
>  **(c)** Deeds, liens or contracts.
>
> ***
>
> **4. Loss Payment**
> We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:
> **a**. We have reached agreement with you on the amount of loss; or
> **b**. An appraisal award has been made.

(Doc. 34-3, at 69, 73-74) (insurance policy). Giving these contract terms their plain and ordinary meaning, *see Rose*, 575 N.E.2d at 461, the Court finds there is sufficient evidence to show Defendant properly paid Plaintiff's lost income claim in accordance with the contract.

In a letter from Guhl to Plaintiff dated June 21, 2018, Defendant explained how it arrived at the $14,900 lost income figure:

> We agreed that the business could have been repaired and back in operations after 6 months and that is the time frame we agreed to review for any loss of business income [ ] you wished to present.
>
> The documents you presented were for rent payment[s] that you claimed were ongoing to the landlord in the amount of $4,100 and $1,800 per month for the loan agreement entered into with your managers Dohnovan Walton and Travis Murphy.

(Doc. 34-6, at 1). As Guhl testified, Plaintiff provided no other evidence of lost income during the claims process; Defendant paid the claim based solely upon a submitted rental agreement between FWB and its landlord as well as Walton and Murphy's intent to purchase agreement. *See* Doc. 33-1, Guhl Deposition, 40:1-25, 41:1-15 ("Guhl Depo."); *see also* Doc. 34-7 ("Sworn Statement in Proof of Loss" submitted by Plaintiff containing the rental agreement and intent to purchase agreement). Plaintiff argues it is owed an additional $33,632.02. (Doc. 37, at 5). It argues this

figure represents the proper income-loss calculation which is based upon a six-month restoration period, as agreed, but that the six months of revenue considered should be six times the average monthly amount of income the business had when Bussdieker was still in control. *Id*.

The conjecture that is Plaintiff's argument falls far short of the support needed to meet its burden to show entitlement to coverage under the insurance contract. *Hiermer*, 720 F. Supp. at 1314 ("Under Ohio law, the burden is on the insured to prove that he is entitled to coverage by showing facts sufficient to establish that his loss was within the description of the policy."). The contract language clearly dictates four factors Defendant considers when it pays a lost income claim: 1) net income before the loss occurred; 2) the likely net income of the business if the loss had not occurred; 3) operating expenses just prior to the loss; and 4) other relevant documents provided by the insured, including deeds, liens, contracts, bills, invoices, or financial records. (Doc. 34-3, at 73-74). Moreover, the insurance contract unambiguously states that, for the claim to be paid, Plaintiff must detail its losses in a "sworn proof of loss" and said statement must be submitted within 60 days after Defendant requests it. *Id.* at 73.

Defendant has demonstrated, and Plaintiff has not contested, the only documentation provided by Plaintiff *during the claims process* to support its income loss was a rental agreement between Plaintiff and its landlord and Walton and Murphy's intent to purchase agreement. *See* Guhl Depo. 40:1-25, 41:1-15; *see also* Doc. 34-7 ("Sworn Statement in Proof of Loss"). Plaintiff submitted *no evidence* to Defendant of net income earned prior to the fire and *no evidence* of its operating expenses "just before" the fire. *Id*. Instead, Plaintiff now attempts to hang its hat on the second factor – the "likely net income of the business if the loss had not occurred". (Doc. 34-3, at 73-74). It argues the loss calculation should have been based on business's likely income had Bussdieker regained control. (Doc. 37, at 5). In support, Plaintiff argues the policy language directs

9

Defendant to pay the *likely* lost business income for the period of restoration and "[s]ince there is no basis to find that [Walton and Murphy's] payment was likely to continue, and instead there was a strong likelihood that control was going [to] revert to Bussdie[]ker's control of FWB immediately following the loss, the likely lost income is what FWB would have made while under Bussdie[]ker's day-to-day management." *Id*. As evidentiary support, Plaintiff attaches a spreadsheet prepared by Bussdieker reflecting Plaintiff's income from January 2016 to December 2017 (Doc. 37-9), and tax documents showing revenue for select months from 2015 through 2017 (Doc. 37-11). However, Plaintiff has provided no evidence it submitted these, nor any other evidence, to Defendant *during the claims process* to support an income loss claim under the "likely income" factor. Indeed, the "Sworn Statement in Proof of Loss" (Doc. 34-7), submitted by Plaintiff during the claims process, does not contain these documents – only the lease and the intent to purchase agreement.

Plaintiff argues it provided Defendant with proof of income at different times during Bussdieker's tenure as manager. In support, it directs the Court to two emails (Docs. 37-4, 37-5) which it contends demonstrate that, in November and December of 2017, it provided Defendant "with information related to estimates of business income" as part of a scheduled policy audit. (Doc. 37, at 4). Plaintiff also points to documentation it received from Defendant during the original policy application process in 2015 where Defendant explained its policy premiums were based upon "gross sales" numbers. *See* Doc. 37-3, at 3. There are a few problems with Plaintiff's evidentiary support. First, and fatal to Plaintiff's claims, is it has not demonstrated the revenue estimates in the emails were provided to Defendant during the claims process in a sworn statement of loss as the insurance contract unambiguously requires. (Doc. 34-3, at 73) (policy); *see also* Doc. 34-7 ("Sworn Statement in Proof of Loss"). Second, the policy application does not contain any

information regarding the specifics of Plaintiff's income – it merely notes the total exposure under the contract (including restaurant and liquor) was $700,000 – and that figure, on which Defendant based its premium, was "Gross Sales". (Doc. 37-3, at 3). And again, even if this document contained specific sales numbers, Plaintiff has not demonstrated it provided this to Defendant as support for its income losses during the claims process as required by the insurance contract. (Doc. 34-3, at 73).

Central to Plaintiff's business income loss claim is the assumption Bussdieker would have regained control of South End Grille in January 2018 if the fire had not occurred. (Bussdieker Aff. at ¶13). The uncontradicted evidence Defendant presents to the Court demonstrates otherwise. Here, Defendant offers a letter to the Ohio Department of Liquor Control dated October 24, 2018, where Bussdieker stated he was actively seeking "1 or 2 people" to sell the business to as he "d[idn't] want nothing to do with" it anymore. (Doc. 34-1, at 60). This letter was written ten months *after* Bussdieker avers he "began making arrangements to take control again in January 2018." (Bussdieker Aff. at ¶13). Plaintiff fails to present any evidence to the Court regarding exactly what "arrangements" Bussdieker made, nor does it present evidence Bussdieker demonstrated such to Defendant during the claims process. In fact, Plaintiff submits no evidence anyone at Auto Owners had this information in its possession at the time Plaintiff's claim was investigated and paid. Moreover, assuming *arguendo* Bussdieker would have resumed management of South End Grille had the fire not occurred, there is no evidence Plaintiff submitted anything to Defendant to show the business income would have immediately reverted back to its Bussdieker-era amounts following the tumultuous tenures of Good, Walton, and Murphy. In essence, Plaintiff asks Defendant to pony up $33,632.02 without any evidentiary support. Plaintiff loosely argues it submitted evidence of its income to Defendant at other times – once when

applying for the policy, and at other times during scheduled audits. *Id*. at 4; *see also* Docs. 37-4, 37-5. However, Plaintiff had a contractual duty, *in the event of loss*, to provide Defendant with information related to its lost income, within 60 days after Defendant requested it – not before. (Doc. 34-3, at 73). The evidence clearly shows Plaintiff provided nothing beyond its lease and intent to purchase agreements. *See* Doc. 34-7. As the terms of the policy dictate, Defendant is only obligated to pay supported claims. *See* Doc. 34-3, at 74; *see also* Doc. 34-7, at 1 ("I understand I must support my claim through the submission of appropriate documentation[.]").

For these reasons, the Court finds Plaintiff has not presented sufficient evidence to demonstrate a genuine issue of material fact regarding whether Defendant breached its duties under the insurance contract when calculating Plaintiff's income loss claim.

*Property Cleaning and Loss*

As part of its breach of contract claim (Count One), Plaintiff also argues Defendant failed to fully compensate for costs related to cleaning restaurant equipment. (Doc. 37, at 9) ("The covered losses sustained by FWB that Auto Owners failed to pay involve loss of business income and costs related to cleaning heavy equipment."). However, this is as far as Plaintiff's "argument" goes. Plaintiff does not elaborate as to what, if any, cleaning Defendant refused to cover. *See generally* Doc. 23 (Amended Complaint); *see also* Doc. 37 (Opposition to Motion for Summary Judgment). It does not argue any additional monies are owed. Even so, Defendant argues it rightly denies further coverage – beyond the $18,880.76 it already paid for property damage (including cleaning) – because Plaintiff violated the policy's concealment or fraud clause when it made material misrepresentations during the claims process by: 1) including a cost incurred for cleaning by Cousino Restoration for $13,330.96, which never occurred; and 2) inaccurately listing the

12

liquor permit as a loss incurred in the fire. (Doc. 34, at 20-23). According to Defendant, these misrepresentations void coverage under the contract. *Id*.

Concealment or fraud clauses are fully enforceable under Ohio law. *Taylor v. State Farm Fire & Cas. Co.*, 2012 WL 1643877, at *3 (N.D. Ohio) (citing *Smith v. Allstate Indem. Co.*, 304 F. App'x 430, 431-32 (6th Cir. 2008)). To void an insurance contract due to concealment or fraud, the insured must make a material misrepresentation. *McCurdy v. Hanover Fire & Cas. Ins. Co.*, 2013 WL 4050909, at *3 (N.D. Ohio). "A misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Latimore v. State Farm Fire & Cas., Co.*, 2012 WL 3061263, at *4 (N.D. Ohio). An insurer may void a contract if it finds the insured made a material misrepresentation during the insurer's investigation into his or her claim. *McCurdy*, 2013 WL 4050909, at *3. Misrepresenting the value of property lost in a fire bears materially on the amount the insurer is obligated to pay the insured under the policy. *Taylor*, 2012 WL 1643788, at *3; *see also Latimore*, 2012 WL 3061263, at *7 ("Misrepresentations regarding an insured's financial condition or items lost in a fire constitute material misrepresentations."); *Parker v. State Farm Fire & Cas. Co.*, 1988 WL 1058394, at *4 (N.D. Ohio) ("Statements of an insured misrepresenting the extent of loss . . . are clearly material since they affect the extent of the insurer's obligation to pay for a claimed loss.").

Relevant here is the concealment or fraud clause in the parties' contract:

**A.      CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1.      This Coverage Part;
2.      The Covered Property;

>    3. Your interest in the Covered Property; or
>    4. A claim under this Coverage Part.

(Doc. 34-3, at 90).

Here, Defendant asserts it paid Plaintiff $33,780.76 to settle the insurance claim at issue. (Doc. 34, at 19); (Bussdieker Depo. 24:16-25). It argues this amount covered the damage to, and cleaning of, Plaintiff's personal property, as well as lost business income. (Doc. 34, at 19). Of the total, Defendant paid $18,880.76 for property damage. (Bussdieker Depo. 29:4-7); (Doc. 34, at 26). Defendant argues it owes no further monies to Plaintiff because Plaintiff made material misrepresentations during the claims process when it included: 1) a cost incurred for cleaning by Cousino Restoration for $13,330.96, which never occurred, and 2) inaccurately listed the liquor permit as a loss incurred during the fire. (Doc. 34, at 20-23).

Regarding the Cousino Restoration item, Defendant offers Bussdieker's "Sworn Statement in Proof of Loss" which includes a line item cost for "Cousino Restoration" in the amount of $13,330.96. (Doc. 34-7, at 9). It also includes $3,550.00 for cleaning performed by Bussdieker himself. *Id*. However, as Bussdieker testified, Cousino Restoration never performed cleaning work at the restaurant. (Bussdieker Depo. 96:1-25). Once Bussdieker saw Cousino's full estimate (which he attached to his loss statement at Doc. 34-7, at 19-21), and learned the company required up-front payment, he decided to clean himself. *Id.* at 57:5-17. Further, as Defendant notes, Plaintiff included a $2,844.00 claim for a lost liquor permit in its "Sworn Statement in Proof of Loss". (Doc. 34-7, at 9). Plaintiff admits it never lost its liquor permit in the fire; it was placed in Safekeeping with the Ohio Department of Liquor Control on December 27, 2017. (Bussdieker Depo. 77:11-19, 78:5-17); *see also* Doc. 34-1, at 51 (Safekeeping confirmation letter). Defendant argues including such in a sworn loss statement, along with the Cousino Restoration item, amounts to a violation of the concealment or fraud clause in the parties' insurance contract. The Court agrees.

14

Under a plain reading, the abovementioned concealment or fraud clause states a misrepresentation of a material fact concerning a claim under the policy amounts to fraud. (Doc. 34-3, at 90). As explained, these clauses are fully enforceable under Ohio law, *Taylor*, 2012 WL 1643877, at *3, and any misrepresentation of loss incurred during a fire is a material misrepresentation, *Parker*, 1988 WL 1058394, at *4. Here, there is no dispute Plaintiff included both items, as losses, within its "*Sworn* Statement in Proof of Loss". (Doc. 34-7, at 9) (emphasis added). By signing this loss form, Bussdieker, as Plaintiff's representative, swore the cleaning item and lost liquor permit were losses incurred in the fire. *See* Doc. 34-7, at 1.

Plaintiff counters the concealment or fraud clause was not violated because, as Defendant acknowledged in Guhl's letter, Defendant did not pay for these alleged losses. (Doc. 37, at 14); *see also* Doc. 34-6, at 4 (letter from Defendant which explains "You added onto the Personal property form, a cost for the liquor permit and the cost for what Cousino construction would have charged you for the work you performed on cleaning your items. These charges are not being considered as they were not incurred in this loss."). Whether Defendant paid the losses or not is immaterial. All the concealment or fraud clause requires to void coverage is that Plaintiff misrepresent a material fact, *i.e.*, the cleaning and liquor permit losses, to Defendant during the claims process. (Doc. 34-3, at 90). As Defendant has shown, Plaintiff did just that. Plaintiff does not counter this allegation.[2]

For these reasons, the Court finds Plaintiff has also not presented sufficient evidence to create a genuine issue of material fact about whether Defendant breached its contractual duties

---

2. Because the Court finds Defendant entitled to summary judgment for the reasons stated above, it need not reach Defendant's alternative argument that Plaintiff also voided coverage by failing to supply complete information regarding damaged property.

when processing Plaintiff's claims regarding property cleaning and business income loss. Thus, Defendant is entitled to summary judgment as to Count One.

Bad Faith – Count Three

Defendant next argues Plaintiff's bad faith claim (Count Three) fails as a matter of law because Plaintiff breached the terms and conditions of the insurance contract. (Doc. 34, at 26-27). Plaintiff argues a bad faith claim may still survive where an insurer lacks "reasonable justification" when it fails to investigate or pay a claim. (Doc. 37, at 6). Further, Plaintiff asks this Court to stay a decision on the bad faith claim pending further discovery. Specifically, Plaintiff contends Defendant has yet to provide a copy of its "claims manual" which may yield information as to whether Defendant adjusted the claim without "reasonable justification." *Id*. at 36-37.

"Under Ohio law, an insurer owes a duty of good faith to it its insured in the processing, payment, satisfaction, and settlement of the insured's claims." *Marsteller v. Sec. of Am. Life Ins. Co*., 2002 WL 31086111, at *4 (N.D. Ohio). "The appropriate test to determine whether an insurance company breached this duty and denied an insurance benefit in bad faith is the 'reasonable justification' standard." *Id*. (quoting *Friendly Farms v. Reliance Ins. Co*., 79 F.3d 541, 545-46 (6th Cir. 1996)); *see also Zoppo v. Homestead Ins. Co*., 644 N.E.2d 397, 399-400 (Ohio 1994) ("[O]ver the past forty-five years this court has consistently applied the "reasonable justification" standard to bad faith cases."). "The crucial inquiry is whether 'the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial,' not whether the insurance company's decision to deny benefits was correct." *Rauh Rubber, Inc. v. Berkshire Life Ins. Co*., 202 F.3d 269, 269 (6th Cir. 1999) (unpublished table decision) (quoting *Thomas v. Allstate Ins. Co*., 974 F.3d 706, 711 (6th Cir. 1992)). Thus, "[t]o withstand a motion for summary judgment in a bad faith claim, an insured must oppose such a motion with evidence

16

which tends to show that the insurer had no reasonable justification for refusing the claim." *Marsteller*, 2002 WL 31086111, at *5.

Here, Defendant did not refuse or deny Plaintiff's insurance claim – it paid the claim. The only debate is to whether Plaintiff was entitled to *more* money for lost business income and property cleaning. As discussed *supra*, it was not. Defendant is entitled to summary judgment on a claim that Plaintiff is owed additional compensation because it failed to comply with the terms and conditions of the policy by providing the proper documentation to Defendant to support income loss greater than $14,900; Plaintiff also violated the concealment or fraud clause when it materially misrepresented items lost during the fire. Defendant rightly paid $14,900 on the income loss claim because this is the only figure which had evidence to support it. *Marsteller*, 2002 WL 31086111, at *4. There is no need to wait for a claims manual, as Plaintiff suggests. Plaintiff either submitted documentation to Defendant to support its income loss as required by the policy, or it didn't; it either materially misrepresented its losses, or it didn't. Here, as discussed *supra*, Plaintiff was properly compensated under the terms of the policy based upon the evidence it submitted to Defendant during the claims process. Plaintiff presents no evidence Defendant acted in bad faith in refusing to pay more. *Marsteller*, 2002 WL 31086111, at *5.

For these reasons, Defendant is entitled to summary judgment as to Count Three.

Negligence – Count Two

Finally, in Count Two, Plaintiff alleges Defendant owed a duty of good faith and breached that duty by negligently failing to investigate the insurance claim, informing Plaintiff it would not pay the policy limits, and failing to train and supervise its employees. (Doc. 23, at 3). Defendant does not independently address the negligence claim in its Motion for Summary Judgment, but

17

encompasses such in the argument that it did not act in bad faith in handling the claim. *See* Doc. 34, at 26-27.

A breach of the duty of good faith, as pleaded here in Count Three, is distinguishable from negligence, as pleaded in Count Two. "A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." *Wasserman v. Buckeye Union Cas. Co.*, 290 N.E.2d 837, 840 (Ohio 1972). Negligence is a separate, less serious tort, one where a tortfeasor's action falls below a reasonable standard of care. *See Gedeon v. E. Ohio Gas Co.*, 190 N.E. 924, 925 (Ohio 1934) ("Negligence is the failure to exercise that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances.") (internal quotation and citation omitted). "Ohio maintains the traditional elements for negligence: duty, breach, causation, and harm." *Ross v. PennyMac Loan Servs. LLC*, 761 F. App'x 491, 498 (6th Cir. 2019).

Upon review of the negligence claim in the Amended Complaint (Doc. 23, at 3), it is clear Plaintiff does not allege Defendant owed it a duty independent of any already encompassed by the insurance contract. Plaintiff asks for economic damages in return for Defendant's negligence. *Id.* at 3, 5. Problematic for Plaintiff is that this scenario is specifically barred by the economic loss doctrine which, in essence, "holds that absent tangible physical harm to persons or tangible things there is generally no duty to exercise reasonable care to avoid economic losses to others. These losses may be recovered in contract only." *Long v. Time Ins. Co.*, 572 F. Supp. 2d 907, 911 (S.D. Ohio) (internal quotation and citation omitted); *see also id.* ("Ohio law precludes the recovery of

economic damages 'where recovery of such damages is not based upon a tort duty independent of contractually created duties.'" (quoting *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 569 (6th Cir. 2006)). In short, the existence of the insurance contract prevents Plaintiff from recovering economic damages on a negligence theory.

Moreover, as discussed fully herein, Defendant did not act in bad faith in settling Plaintiff's insurance claim because it was reasonably justified in settling for the amount paid. The reasonable justification stems from Defendant's thorough investigation into the claim. The investigation revealed Plaintiff made material misrepresentations during the claims process regarding losses incurred during the fire. Moreover, Plaintiff failed to provide documentation to support its business income losses. Because these failures are Plaintiff's alone, it cannot reasonably be said Defendant acted negligently by breaching its duty to handle Plaintiff's claim carefully and prudently. As discussed, *supra*, Defendant investigated and paid Plaintiff's claim based upon the information Plaintiff provided during the claim's process in accordance with the unambiguous terms of the insurance contract.

Because Plaintiff cannot show Defendant breached a duty, independent of one already contemplated by the insurance contract, Count Two fails as a matter of law and Defendant is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 34), be and the same hereby is, GRANTED.

   s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE